Next case on the docket is 5-13-373, and I don't want to butcher the name. Schlechte, I can't even pronounce it, versus Budde. Counselor, you ready to proceed? May I please report? My name is Willie Austin. I represent Lawrence and Vera Budde. They were the original defendants in the trial court. They were the counterplaintiffs, and they were the appellants before this court. The Buddes are the record owners of a 40-acre parcel of real estate in Clay County. It's specifically described in the record, and it's in the form of a square. This property was acquired by the Buddes in 1985. The Schlechte are the record owners of a 40-acre parcel of real estate as well in Clay County. It's also specifically described in the record, but rather than being the normal rectangle, it's oriented north and south, and it's more narrow in width and longer in length. The Budde real estate and the Schlechte real estate are both devoted exclusively to agricultural use. The Buddes farm the Budde property, and the Schlechtes farm the Schlechte property by means of a tenant. The Budde property is located east of and adjacent to the Schlechte real estate, and the parties share a common boundary line. The west line of the Budde square 40 acres is next to the east line of the Schlechte, or the north part of the east line of the Schlechte real estate, since the Schlechte real estate extends further south. There's a drainage ditch that is oriented also in a north-south direction, and it's located either along or near the common boundary between the two parties. Now, the issue before the trial court was, where is the correct location of this shared boundary line between the parties? The Buddes began farming their property and other lands as tenants of a family by the name of Williams. This was in 1958. Several years later, in 1985, the Buddes bought the property from the Williams family. From 1958 up until the present time, the Buddes have continuously and exclusively farmed their property. The Schlechte land is a part of what was once a larger parcel of real estate, and that larger parcel, including what is now the Schlechte property, was formerly owned by Lois Schlechte's parents, John and Minnie Traub. There were a series of conveyances before and after Minnie Traub's death, and I'm oversimplifying things, but eventually the Traub property was divided into halves, and the Schlechte's ended up with the east part of the Traub property, which is the part that adjoins my client's, the Buddes. Now, to facilitate this division of the Traub property, the Schlechte's commissioned what we call the Brummer Survey, and the matter that's now in controversy really stems from the results indicated by that survey. Now, once the Brummer Survey results became known, the Cox Survey was commissioned by the Buddes, but we'll talk more about that later. The Buddes, who were already farming what became their property, began farming the Traub property. Now, that was beginning about 1975, and that was while the Traub's were still alive. And I should say at this point that John and Minnie Traub were, or John Traub was not only Lois Schlechte's father, he was also Lawrence Budde's uncle. Mrs. Schlechte and Mr. Budde, our first cousin. Now, John Traub died in 79, and Minnie Traub died a couple of years later. And the Buddes continued to farm what was the Traub property after both of the Traub's had passed away, and they continued to do so through the 2000 Traub year. Now, by that time, the Buddes were not farming for the Traub's anymore, they were farming for Lois Schlechte and her brother, who then owned the property. And I'll just add at this point, when I refer to ownership, we're talking about beneficial ownership. The Schlechtes and the Buddes respectively own their real estate through inter-biose trusts. That's not really relevant to the issues here, but when I say ownership, I'm not talking about legal ownership, I'm talking about beneficial ownership. But in total, the Buddes farmed the former Traub property for approximately 25 years. When the Buddes began farming the Traub property, that part of the Traub property that was adjacent to the Buddes, just west, was devoted to grain farming. Further to the west, the Traub's had livestock, and they also had livestock on their property further south that's of no consequence here. The Buddes farmed the Budde property up to the drainage ditch on their west side, and they also farmed, when they were farming the Traub property from Traub's, they farmed the Traub property to the east line up to the drainage ditch as well. And the Buddes maintained that drainage ditch. Since the drainage ditch, at least to the Buddes' way of thinking, to the best of their knowledge, was half on their property and half on the Schlechtes' property, those maintenance efforts benefited both parties. As a practical matter, you really can't maintain half a ditch very well. You have to maintain both sides of it. From 1958 until 2012, when the Brummer survey was produced, it was the Buddes' understanding that the center line of the drainage ditch was the common boundary between their respective properties. Prior to the year 2012, no one had ever claimed ownership of any of the property east of the drainage ditch, contrary to the Buddes' interest in that property. No claim was ever asserted that was adverse to the Buddes' claim of ownership until after the Brummer survey was produced. Now, the Schlechtes contend that there was a livestock fence in existence for a period, some period of time, and that this fence was also a boundary fence, and that this fence was located on the Budde side of the drainage ditch. According to Warren Schlechte's testimony, the fence was located, quote, very close to the record common boundary line determined by Surveyor Brummer. The Schlechtes also contend that the fence was removed in the 1998-1999 timeframe, ostensibly, by the Buddes. Now, the Buddes contend that there was never a fence on the east side of the drainage ditch, nor was there ever a fence in the vicinity of the drainage ditch on either side, for that matter. And that's at least since 1958 when they started farming as tenants for the Williams family. Now, they don't necessarily deny that there may have been a fence at some time. They only contend that if there ever was a fence, it was prior to 1958 when their familiarity and use of the property began. The Buddes also, of course, deny ever having removed any fencing in the vicinity of the drainage ditch. The parties, in this case, do agree on the common corner at the south end of their respective, or the south end of the common boundary line. They disagree on the north end where the lines allegedly spread apart. Now, property is taken by adverse possession when certain elements exist concurrently for 20 years. Continuous possession, that is hostile or adverse, that is actual, that is open, notorious, and exclusive, and under claim of ownership inconsistent with that of the true owner. These are the off-cited elements of proof. Most recently, they're most commonly cited in the Joyner v. Jansen Illinois Supreme Court case that we have in our brief. The judgment of the trial court was contrary to the manifest way of the evidence in this case. The evidence supports the Buddes proposition that the center line of the drainage ditch is, in fact, the common boundary line between the parties. The Buddes prove each element of their claim to title by adverse possession by clear and convincing evidence. The adjoining property owners treated the drainage ditch as their common boundary line from at least as early as 1958, and until shortly before this suit was filed in 2012. That's over 50 years. I mentioned the Brummer and Cox surveys. They conflict with one another. However, the boundary evidence of adverse possession presented in trial trumps both of the record boundary surveys. So for that reason, I'm really not going to say much about the surveys. But there were two expert witnesses of the trial, Surveyor Cox and Surveyor Brummer. Both of those surveys testified that from all outward appearances, the line of possession dividing the two properties was, in fact, the drainage ditch, satisfying certainly one of the elements of proof in this case. Also, the close correlation of the Cox survey to the alignment of the drainage ditch only serves to corroborate the Buddes position. Every single lay witness who testified at trial, except for the selectives and their two children, testified unequivocally that the drainage ditch was regarded as the boundary line. Daryl Budde, another relative of both parties, who was the only disinterested witness called by the selectives, was one. Fred Grove, Gerald Bernson, and Alan Budde all testified in support of the Buddes position. The Buddes' denial that the alleged boundary fence existed is based on their personal observations over a period of many, many years. Both Lawrence and Vera Budde testified that they were personally involved in farming their property each year since 1958. Personally. And that each year they farmed up to the edge of the ditch. And never during that period of time did they encounter any obstruction, a fence or anything else for that matter, that would have prevented them from farming up to the edge of the ditch. They also testified that they never saw any remnants or other evidence that a ditch had ever been located in the vicinity of the drainage ditch on the east side. I'm sorry? The selecting testimony is inconsistent regarding the alleged fence. Lois placed the alleged fence four to six feet east of the ditch, while her husband Warren said it was ten to twelve feet. What about the surveyors? Where did they place the fence? The Cox survey at the north end, as you recall, the Cox survey had the lines approximately five feet apart. The Brummer survey had it ten to twelve feet. But it was east of the ditch. In both cases east of the ditch. In both cases. And the Cox... At the north end the ditch actually flares a bit to curve into a drainage ditch that's maintained along the Effingham County road. So was it appropriate for the court to consider that testimony? Which testimony, Your Honor? Of both Cox and Brummer with respect to a finding, their finding that it was east of the ditch, the line. I think it was entirely appropriate for the court to consider the testimony and the findings of either or both of the two surveyors. Ultimately, I think what carries the day is the claim of adversitization, not an argument as to which surveyor is right and which surveyor is wrong. And what about the testimony regarding the fence? How, of what weight do you think that had with respect to your claim of adverse possession? If the court finds that in fact the fence existed and that the fence existed up into the 1998-1999 time frame, that bars the claim of adverse possession. And that would be a credibility issue that the court would have to decide the fence existence and when it was torn down. I think it's more than credibility, Your Honor. I think it's also, credibility is part. Whether the witness has an interest in the outcome or doesn't have an interest in the outcome. The other part is the weight of the evidence, I believe. And I think on both points, the booty should prevail. The booty's son also placed the line at the north end in a different location than Warren Schlechty. Warren Schlechty's testimony more or less coincided with the Brummer survey. We didn't know that until after the Brummer survey had been produced. Alan Booty, who is the booty's son, is now in his mid-fifties. He started farming with his parents when he was just a youngster and he still farms the property now for that matter. And he testified, he had no recollection of there ever being a ditch, I mean, excuse me, a fence along the drainage ditch. And he also testified that when they were farming both the Traub-Schlechty property on the west side and their own property on the east side, from time to time they would move from one field to another and there was no fence in the way of that movement down toward the south end of the property where ditches were shallow. They would use that area to cross. There was no interdiction to the crossing. What about the testimony that there were cattle that grazed in that area at one time? Doesn't that imply the necessity of some kind of fence? There was testimony concerning a livestock operation. John Traub had livestock on the property. The livestock on the property, however, were located some distance west of the area in question here. Was that disputed? It is disputed. So that would also be a credibility issue that the court had to resolve. Let me answer it in this way. The Schlechty children testified that when they were young, they lived in town, but they would go down to the farm on the weekends and they would play in the field, and the field they played in was a pasture, and they would run across the pasture up to the ditch and jump the ditch where there was water in it and this sort of thing. We produced a USDA area photograph dated in 1960 when those children were, the oldest was about four and the younger was about one year old, showing clearly that that area field next to the ditch on the Traub-Schlechty side was cultivated. It wasn't a pasture. The livestock operation was further west by an eighth of a mile or so. There was also livestock further south as well, but that doesn't really have anything to do with what we're talking about here. So it's more than a credibility issue, I believe, Your Honor. I think it's impossible that that recollection could be true. Fred Grove was a disinterested witness. He spread fertilizer for a local farm service co-op. His recollection of the Booty Farm went back into the 80s. He said he spread fertilizer annually for a period of 20 to 24 years. He further testified there was no fence or other obstruction along the west side of the Booty's property that prevented him from spreading fertilizer up to what he called the boundary ditch. Another disinterested witness was Gerald Bernson. He had been a neighbor for years and actually related again to both of these people, both sides. He drove past the disputed area for many, many years going to and from work. He testified that at least since 1973 there was no such fence. The only disinterested witness, and by that I mean a witness that's neither a party nor a family member, all testified consistently with Booty claiming that the ditch was the boundary line and that there was no fence of any sort in the vicinity. There is no physical evidence of a fence in the vicinity. There is no photographic evidence of a fence in the vicinity. The... Please support. Represent the title holders, the Schleppys. In our brief we raised two issues. The first issue was whether the trial court's finding that the Booty's failed to prove clearly and unequivocally the elements required to establish a title by adverse possession was contrary to the manifest way of the evidence. The second issue we raised is whether the court's finding that the plan of survey prepared by Herman Brummer is more accurate, credible, and reliable was contrary to the manifest way of the evidence. As Mr. Austin just, I believe, conceded and has set forth in their reply brief, they're not raising an issue as to the court's determination that the Brummer survey was the superior survey. But they do acknowledge that both surveys established the line to the east of the ditch. The survey, and there was another expert witness that was called a... Mr. Garrett? Mr. Garrett? Yes. And he had set the original point that was relied upon by the Schleppys surveyor, Mr. Brummer, and he confirmed that point in his testimony. And keep in mind that Brummer did this as suggested by Mr. Austin, not in anticipation of litigation, but in an effort to determine the boundary line because he was doing a survey when the Schleppys divided the acreage with their sister-in-law or Laura's sister. So he totally independent when he did it at the time. Now, as to the issue of adverse possession, the trial court specifically stated that he weighed the credibility of the evidence. And I believe that he determined the credibility of the Schleppys and their witnesses was superior to the credibility of the Bootys and their witnesses. And that was the genesis of his decision. In the reply brief, the Bootys talk about a case. The case stands for the proposition that agricultural activity alone is insufficient to establish a claim of adverse possession. And that is the Morris v. Humphrey case. And in there, they make quite a bit in the reply brief trying to distinguish that case. And the factual rendition that they make in their reply brief, I believe, is a bit inaccurate. But the thing that is inaccurate in their brief on page, their reply brief, given that the plaintiff's land was never cultivated, the court found that it was vacant and unenclosed and thus found that the defendant's use of the 80-foot incursion was permissible. That's not an accurate statement of the case in the Humphrey case, but the disputed area was clearly under cultivation for years. And so I think that case is good law for the position that the trial court found that that activity is insufficient to indicate that the person claimed by adverse possession had seized the land, unfurled their flag, and made it known to the world that they claimed that to be the boundary line as required under the doctrine of adverse possession. Now, that finding, I think, is sufficient to establish the trial court, the rightness of the trial court's decision. I'm not sure it's necessary. I think there are some other sufficient facts that establish the trial court's decision. The surveys both came in on the Eastside condition. The trial court determined that the Brummer survey is the best one, and that came in approximately 12 feet east of the ditch. So that's the—we know that's the line, and that's certainly consistent with Warren Slecky's testimony that on Thanksgiving, after he came onto the service, the first time that he was able to have Thanksgiving dinner with his in-laws and his wife, they got in his dad's car, his father-in-law's car, and they drove over and inspected the ditch that had been constructed by his father-in-law and had been constructed to the west side of the existing fence. And that testimony, I think, is very, very credible. And it's also corroborated with his children's testimony that they did indeed play their field, that their cattle up to the fence, and the fence was on the east side of the ditch. So that testimony, and if you take that testimony and say it's credible, which the trial court did, that is also sufficient to sustain the trial court's judgment. Now, the survey line—well, no more trial. The testimony of Ellen, who I actually think helps us a little bit, in the sense that while the trial was in progress, he was out there working on the ditch. And then when he came to trial, I cross-examined him about that, and he admitted that when he got to the north part of the ditch, that he had to curve into the selecting land because the ditch terminated to the west of a north and south line. Now, if I'm going to construct a ditch, and I want it to drain my property, I'm going to construct it so that the final drainage goes onto my property, so I don't invade my neighbor's property. It wasn't true north and south, which means that it probably wasn't a boundary line. And the way that it curved is evidence that it was built in such a manner as to be owned by and constructed by the selectee's predecessors in title. So all of that is sufficient to sustain the trial court's judgment. The trial court found that there was indeed a fence, and all of the testimony about the fence was that it was there until 1998. That's less than 20 years ago. The fence existed until 1998. That defeats the claim, the adverse possession claim. The argument a moment ago about the USDA aerial photo, if you look at the record carefully about that, that document was admitted for demonstrative purposes only to show the location of the various farms and homesteads. It wasn't offered as a depiction of the farming activities and the like. Fred Groh, he was the person that worked for FS. First of all, he never looked at a map. Secondly, at the time that he claims to have been spraying and using this boundary line, this ditch is the boundary line, the Booties, the adverse title claimants, were also farming the selective property. And yet he didn't spread fertilizer or whatever on the selective property. It doesn't make sense. They're farming it all. Why would he also be there over a number of years? Because surely they would have bought their inputs from the same place. So I think his testimony is suspect. Then that also brings us to Darrell Bootie's testimony. I called for the plaintiffs, for the record title, changed his testimony from what he said in his deposition. I impeached him several times. Then he was cross-examined by the adverse possession claimants and attempted to be rehabilitated. During that exchange, I suggested the court consider the entire deposition testimony, and the court admitted it. If you read that deposition, there is no way he was mistaken at the time of the deposition. He testified clearly and precisely that he knew about the dispute before he got there, that he was familiar with the ditch and he identified a picture of it that was later identified in trial by Mrs. Bootie, that he maintained the ditch for the selectees, he maintained it as if it was his own, and that there was a fence to the east of the ditch. So that's sufficient testimony to sustain the trial court's judgment. Now, the trial court dismissed his testimony, I believe. They'll see it. But I think if you look at that deposition, his deposition testimony is clear and right on the money and totally consistent with the selectee testimony. That's the extent of my argument. If you have any questions, I'd be happy to answer them. I have no questions. Thank you. Thank you, counsel. Rebuff? Rebuff? One of the most interesting cases, I think, that was cited, that we cited in the brief, was the Klingel case. It's a Fifth District appellate case, and it's almost humorous in a way when it says that the Supreme Court, in another case that we cite, stated the general rule, which is that it is difficult to state any general rule when it comes to matters of adverse possession. So to cite headnote law and to say that land cannot be claimed by adverse possession by cultivation alone, yea or nay, is simply an inappropriate statement because it has to be considered in light of all the other surrounding circumstances. There are no cases cited by either side in this case that is on point on all fours. These cases tend to be very fact-specific, and the facts are typically dissimilar. But it is simply not true to say that land cannot be claimed by cultivation alone without regarding any other circumstances. Now, the trial court, in its judgment, relied on the Dobrinsky case, stating, furthermore, use of vacant and occupied land is presumed to be permissive and not adverse. Well, the fact of the matter is this case did not present a situation involving vacant and occupied land. You can't tell a farmer who is farming property that the property he's farming is vacant and unoccupied. You can't tell a farmer who is maintaining soil conservation or drainage structures on property that that land is vacant or unoccupied. The land in this case is certainly not vacant or unoccupied. That is a certainty. And we believe that the trial court was in error in viewing it as such. In the Morris case, which I'll, that Mr. McPheeber cited, I'll just briefly say there are a number of areas where it can be distinguished, but one was the plaintiff's property in that case was, in fact, vacant and unoccupied, even though it was adjacent to cultivated property. I addressed the testimony of the Schlechte children, which viewed in light of the error in the column simply could not be true. I have no doubt that they have fond recollections and even accurate recollections of what they did. I, it's, their recollection has to be faulty in terms of where on the property they did it. That's the critical point. The Darrell Booty testimony. Darrell Booty, another relative, was the Schlechte's only disinterested witness. Now, they are willing to accept the court's finding that Darrell Booty's testimony was not credible. Yet, on the other hand, they want to rely on certain portions of Darrell Booty's testimony. And they also failed to point out, which is in the deposition transcript, that in at least three places in his deposition testimony, which was received in evidence, Darrell Booty made reference to his wife's serious illness at the time and wanting to leave the deposition to return home and take care of her. He's, at one point he said, I'm going to try to get the wife where she can get on her feet. She can't walk, she can't hold a glass. The aerial photograph, it was used for demonstrative purposes. The objection was that it would be used for purposes of showing the ditch or the fence. The aerial photograph was not of sufficient resolution that it would show the ditch or the fence. If it did, perhaps we wouldn't be having this hearing today. But it did show, it does show the field configuration. It does corroborate the Booty testimony. Thank you, Your Honor. Thank you. Thank you, Counsel. The case will be taken under advisement and you'll receive an order in due course. The next case on the call is...